**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **No. 1:06-cr-76** |
| | ) | |
| **JAY ANN SNYDER,** | ) | **JUDGE COLLIER** |
| | ) | |
| **Defendant.** | ) | |

**OBJECTIONS TO PSR & MEMORANDUM IN SUPPORT**

**COMES NOW**, the Defendant, Jay Ann Snyder, by and through her attorney, and hereby files her objections to the Revised Pre-Sentence Report dated March 21, 2007. The Defendant submits her objections as follows:

**OBJECTION #1** The Defendant objects to Paragraph 17 in that the 2002 Sentencing Guidelines were used to calculate her sentence. Upon belief, the Defendant submits that the 2001 Sentencing Guidelines were used to determine the sentences in the related cases of Angela Marie Byrd, Docket No. 1:04-CR-148-001 and Donovan Barnes-Bass, Docket No. 1:04-CR-148-002. The Defendant believes that there were several fraudulent loans that pre-dated the November 1, 2001 § 2B1.1 amendment. Ms. Snyder pled to count 1 and 2 of the indictment which pre-dated the amendment. Both Ms. Byrd and Ms. Barnes-Bass were involved in the twenty (20) fraudulent loans involving Ms. Snyder. Respectfully, the Court should use the same Guidelines Manuel when calculating the sentence as it did for Ms. Byrd and Ms. Barnes-Bass especially in light of their involvement in the twenty (20) loans at issue in this case. Using a different guideline manual would lead to sentencing disparities between similarly charged defendants.

**OBJECTION #2** The Defendant objects to Paragraph 21 and the loss calculation pursuant to U.S.S.G. § 2B1.1(b). The Defendant objects for several reasons.

First, the PSR fails to calculate the loss in the same manner as the loss was calculated for Angela Marie Byrd, Docket No. 1:04-CR-148-001 and Donovan Barnes-Bass, Docket No. 1:04-CR-148-002. As stated above, using a different loss calculation would lead to sentencing disparities between similarly charged defendants. Upon information and belief, the Court calculated their loss by simply adding the fees that they charged for each fraudulent loan. More specifically, both of the Defendants, Byrd & Barnes-Bass, charged additional fees for the fraudulent portion of the loan. It is the Defendant's belief that the fees associated with the fraudulent portion of the loan were used to calculate their sentence.

Using their "fees" results in a significant disparity between co-defendants as they received 18 month sentences and the Defendant, by using a different calculation, is facing a loss amount just under $400,000. The Defendant submits that this Court should calculate the loss the same as it did for Ms. Byrd and Ms. Barnes-Bass. See *U.S. v. Williams*, 894 F.2d 208 (6th Cir. 1990); *U.S. v. Nelson*, 918 F.2d 1268 (6th Cir. 1990).

Second, and in the alternative, the Defendant avers that six (6) of the twenty (20) loans, #5, 10, 11, 13, 15 and 17 as listed in the PSR, should be excluded from the calculation or at the very least, the loss should be calculated based on the fees Ms. Snyder received as the mortgage broker.

These six (6) loans are distinct from the other fourteen (14) loans. Unlike the other fourteen (14) loans, neither Ms. Snyder, her boyfriend, Mark Wilkins, nor her ex-husband, Roger Durham, were the buyers. Loan #5 was a purchase by Kathy & Gary Phillips. Loans #10, 11 and 17 were purchases by Alan & Sandra Wilsey. Loans #13 and 15 were purchases by Guy and

Julie Alexander. The Defendant, Snyder, was merely the mortgage broker in these six (6) transactions.

Unlike the other fourteen (14) loans, none of these six (6) loans are in foreclosure. Unlike the other fourteen (14) loans, these properties have not been sold and the original purchasers listed above still continue to own said properties and presumably, pay each mortgage. The evidence will show that there has been no loss to any mortgage company associated with these loans. There is no information or allegation that these mortgages are in default. Unlike the other fourteen (14) transactions, neither Ms. Snyder nor Mr. Wilkins received any money at closing other than Ms. Snyder's mortgage broker fee.

There is no "actual loss" associated with these six (6) loans. Application Note 3(A)(i) to U.S.S.G §2B1.1 defines actual loss as "the reasonably foreseeable pecuniary harm that resulted from the offense." Note 3(A)(iv) defines "reasonably foreseeable pecuniary harm" as the pecuniary harm "that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." While there may have been a double-hud and the purchasers may have received additional money at closing from an inflated price, there was obviously no actual loss given the fact that the buyers have owned these properties since 2001, paid all taxes on the property, and paid the mortgage payment since the date of their purchase.

Moreover, there is no "intended loss" with these six (6) loans. Application Note 3(A)(ii) to U.S.S.G. §2B1.1 defines intended loss as "the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g. as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." The clear intent was that these buyers were going to use and operate these properties just as they have done since 2001. The fact that these properties have

the same owners, are current on their taxes and are current on their mortgages is direct proof that they did not intend on any entity suffering any loss from these fraudulent loan application.

Therefore, since there is no actual or intended loss, the loss calculation for these six (6) transactions should be zero, or in the event that Ms. Snyder received a larger mortgage broker fee for the fraudulent portion of the loan, the loss amount should be that additional "fee."

Third, if the Court declines to use the same method as Byrd and Barnes-Bass, the Defendant objects to the method used by the Probation officer in calculating the loss as it mixes and matches several different theories as outlined below:

| Loan No. | Loss Amount | Basis/Method of Calculation |
|---|---|---|
| 1. | $26,995.40(F) | Unpaid Balance after credit for Foreclosure/ Amort. Table |
| 2. | $0 (F) | Sold for Profit at Foreclosure |
| 3. | $19,741.89(F) | Unpaid Balance after credit for Foreclosure sales price |
| 4. | $16,807.95(F) | Unpaid Balance after credit for Foreclosure sales price |
| 5. | $9,500.00 | 95% loan, 95% of Inflated minus True Price |
| 6. | $21,883.82(F) | Unpaid Balance after credit for Foreclosure sales price |
| 7. | $18,454.34(F) | Unknown Sales Price, only what Mark rec'd at Closing |
| 8. | $19,110.31(F) | Unpaid Balance after credit for Foreclosure sales price |
| 9. | $21,209.56(F) | Unknown Sales Price, add Mark & Jay rec'd at Closing |
| 10. | $21,600.00 | 90% loan, 90% of Inflated minus True Price |
| 11. | $22,500.00 | 90% loan, 90% of Inflated minus True Price |
| 12. | $7,596.76 (F) | Unpaid Balance after credit for Foreclosure sales price |
| 13. | $21,600.00 | 90% loan, 90% of Inflated minus True Price |
| 14. | $18,098.58(F) | Unpaid Balance after credit for Foreclosure sales price |
| 15. | $37,800.00 | 90% loan, 90% of Inflated minus True Price |
| 16. | $28,131.91(F) | Unpaid Balance after credit for Foreclosure/ Amort. Table |
| 17. | $16,150.00 | 95% loan, 95% of Inflated minus True Price |
| 18. | $23,835.61*(F) | Unpaid Balance after credit for Foreclosure sales price |
| 19. | $13,774.42(F) | Unpaid Balance after credit for Foreclosure sales price |
| 20. | $25,950.03(F)** | Unpaid Balance after credit for Foreclosure sales price |

**TOTAL**: $390,740.58

*Should be $23,540.61
(F) = indicates Foreclosure
**The Defendant submits that she and Mr. Wilkins were actually the sellers of this property. The Defendant does not believe that a double-hud was used and does not believe that

the price was improperly inflated. Therefore, this entire loan should be excluded from the calculation.

The various theories above can be summarized as follows:

**1. Actual Loss—Unpaid Mortgage minus Foreclosure Sales Price = Unpaid balance (loss amount)**

The first method used in the PSR is calculating is based upon actual loss. The PSR uses this calculation on ten (10) of the twenty (20) properties. They are loans #2, 3, 4, 6, 8, 12, 14, 18, 19, 20**(See reference above to this particular loan #20).

The PSR calculates this loss by taking the actual unpaid mortgage after receiving an amount owed by the mortgage company and subtracts what the property sold for at foreclosure to equal the loss amount.

**2. Actual Loss—Unpaid Mortgage using Amortization Table minus Foreclosure Sales Price = Unpaid balance (loss amount)**

The second method used in the PSR similar to the first method is also based on actual loss. The PSR uses this calculation on two (2) of the twenty (20) properties. They are loans #1 and 16.

The PSR calculates this loss by taking the original loan amount and then uses Agent Tuggle's estimation of the number of payments made by the purchaser, an estimation of the interest rate of the loan and an amortization table to determine the approximate amount of what is owed by the buyers to the mortgage Company on the date of the foreclosure and then subtracts what the property sold for at foreclosure.

**3. Intended Loss—(Inflated Sales Price minus Actual Sales Price) x Loan Percentage = loss amount**

A third method was used for the six (6) properties owned by Alan & Sandra Wilsey and Guy and Julie Alexander and Kathy & Gary Phillips, loans #5, 10, 11, 13, 15 and 17. These are the same properties listed above that the Defendant submits should be excluded.

Since none of these six (6) properties had been in foreclosure nor had been sold, the PSR instead subtracts the actual sales price from the inflated sales price. Then, the PSR multiplies that amount by the percentage of loan. Therefore, if there was an 80% loan for a property that was valued at $30,000 and then inflated amount due to the fraud was $50,000, the PSR made the following calculation ($50,000 - $30,000) x 80% = $16,000 loss amount.

This can not be considered the "actual loss" since the property has not gone into foreclosure nor is there any evidence the mortgage has not been paid. Obviously, given the payment history of this property for the last five years and its current status, there is no "intended loss."

**4. Actual Loss—Unknown Sales Price, what co-defendants received at closing**

In the fourth and final method of calculation, the PSR for loans #7 and 9 did not have the information of what the properties actually sold for at foreclosure. While the Defendant does not dispute that the houses went into foreclosure and were sold, this information is not available.

The PSR calculates the loss based upon what the defendants received at closing. In loan #7, Mark Wilkins received $18,454.34 at closing. The PSR assesses this amount against Ms. Snyder. In loan #9, Mark Wilkins and Jay Ann Snyder received $10,099.24 and $10,260.32 respectively. The loss amount also includes the $850 received by Angela Byrd for this loan for a total of $21,209.56. Therefore, this loss amount is calculated similarly but with Ms. Byrd's fee included.

The Defendant submits that the Court should not adhere to the various theories used by the PSR. The formula combines both intended loss and actual loss. In addition, it calculates actual loss with a number of different formulas.

Under Sixth Circuit law, the loss in a fraudulent loan application case is the amount of the loan not repaid, reduced by the amount the lending institution recovered from any assets pledged to secure the loan. *United States v. Lucas*, 99 F.3d 1290, 1296-97 (6th Cir. 1996); See also, *United States v. Lutz*, 154 F.3d 581 (6th Cir. 1998). It does appear that this calculation was done in some of the properties but not all of them.

The Commentary to U.S.S.G. § 2B1.1 gives credits against loss as follows:

> (i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.

In the present case, the Defendant will show at sentencing that she and her boyfriend never intended on defaulting on these mortgages. She will provide receipts from bank statements, cancelled checks, bank records and actual receipts totaling approximately $45,000 which were monies she spent on each of these properties to repair them and fix them up. See *Itemization of Receipts*, Exhibit "A". She will further provide the Court with lists of improvements that she did on each house. See *List of Improvements*, Exhibit "B". All of the work and services rendered were done before the offense was detected. Respectfully, the Defendant submits that she should get a credit for this amount, i.e. the fair market value of the property returned and her services rendered, and deduct such amount from the loss calculation.

**OBJECTION #3**

The Defendant objects to Paragraph 24 of the PSR for the two (2) level enhancement pursuant to U.S.S.G. § 3C1.1. The Defendant would show that she did not commit perjury

regarding identifying checks while testifying. The Defendant would show that she was shown various checks in a proffer session and identified those checks as Mr. Wilkins handwriting. She will state under oath today that those checks she was shown in the proffer session were Mr. Wilkins' handwriting. The checks that were shown to her at trial were part of a large exhibit and were not the same checks she identified at the proffer session.

In addition, while Ms. Snyder certainly testified that Mr. Wilkins didn't have knowledge of the fraudulent nature of these loans, the Defendant would show she has always maintained this. She first met with law enforcement before she was indicted and voluntarily gave a statement advising that Mr. Wilkins did not know the fraudulent nature of these loans. In a proffer session, after agreeing to tell the truth, she once again maintained that Mr. Wilkins did not know the fraudulent nature of these loans. In fact, she gave the agents information regarding specific prices and addresses involved in the scheme that now appear in the PSR and assisted them in their investigation. They did not have this information before.

Respectfully, the Defendant objects to this enhancement. Application Note 2 to U.S.S.G. § 3C1.1 states that "the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." It is a very real possibility that Ms. Snyder and Mr. Wilkins never talked, discussed or debated the merits of the double-hud scheme. The jury's verdict could have been based on the fact that he made several deposits into his own bank account outside of Ms. Snyder's presence, that he "should have known" of this scheme based on what he was receiving at closing, or as counsel as speculated with the government, it simply could have been that the jury either disliked Mr. Wilkins, disliked Ms. Snyder or liked the AUSA.

Counsel has requested a copy of the jury instructions from the court reporter. It may have been that if a willfull blindness instruction was given, the jury could have found that Mr. Wilkins turned a blind eye to the obvious. If this instruction was given, the jury would not need to find that he "knew" of the fraudulent loan application scheme.

Lastly, counsel for Ms. Snyder suggests that her testimony, i.e. what someone else knew, should not have even been admitted under the *Federal Rules of Evidence*. There is no dispute that the testimony was admitted, but routinely, present counsel included, courts have sustained objections of what one person says is in the mind of the other. It's speculation and lacks personal knowledge under Rule 602 of the *Federal Rules of Evidence*. What is clear is that no one objected and they obviously wanted to hear what she had to say. The Defendant submits that an enhancement should not be appropriate if the testimony at issue should have been excluded under the *Federal Rules of Evidence*.

In conclusion, the Defendant has been dating Mr. Wilkins and living with him since 1999. Prior to trial, she gave a pre-indictment statement to authorities and a 2nd statement in a proffer session, both absolving Mr. Wilkins that he knew of the double-hud scheme. There is no dispute that her third statement on the day of the trial was absolutely consistent with her previous two statements. Respectfully, the Defendant submits that she did not "willfully" obstruct or impede justice and such enhancement is not appropriate.

**<u>OBJECTION #4</u>** The Defendant objects to paragraph #26 and submits that she should receive a reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. The Defendant would show that upon her initial contact with law enforcement she admitted to her role in the fraudulent loan scheme. She timely notified the government of her intention to plead guilty which permitted the government from having to prepare for trial. Her plea allowed the

government to allocate their resources somewhere else. At her proffer session, she assisted authorities by giving them additional addresses where fraudulent activity occurred. At all times, she maintained that she was guilty and has always been remorseful. Her pre-indictment statement gave the authorities all the proof they needed to obtain a conviction against her.

The Defendant first submits that the two level enhancement for § 3C1.1 should not apply, but if this Court finds it does, the Defendant submits that this is the extraordinary case in which "adjustments under both §§ 3C1.1 and 3E1.1 may apply." See *U.S. v. Robinson*, 390 F.3d 853 (6th Cir. 2004)(relying on Application Note 4(e) to § 3E1.1).

The only conduct that the Court can find as a basis for denying her acceptance is her testimony at the trial of Mr. Wilkins, her boyfriend of at least 8 years. As it pertains to her own conduct and her own crime, she has clearly accepted responsibility and maintained her guilt. There are significant references in the application notes to § 3E1.1 that the court should consider whether the defendant demonstrated acceptance for *her* conduct and not necessarily whether she accepted acceptance for the conduct of a co-defendant. Specifically, § 3E1.1(a) allows for a two (2) level reduction as it applies "for *his* offense." Application Note 1(a) states that acceptance includes "truthfully admitting the conduct comprising the offense of conviction and truthfully admitting or not falsely denying any additional relevant conduct *for which the defendant is accountable* under Relevant Conduct…However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility."

Her only denial is his knowledge which she was repeatedly told law enforcement since before the indictment. She has admitted to her conduct and her relevant conduct. Respectfully,

she has accepted responsibility for her own actions and this is an extraordinary case in which she should receive a downward adjustment for acceptance.

Respectfully Submitted:

**DAVIS & HOSS, PC**

s/ Bryan Hoss__________
Bryan H. Hoss, BPR #021529
508 East 5th Street
Chattanooga, TN 37403
(423) 266-0605
(423) 266-0687-Fax

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Motion was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

This the 28th day of March, 2007.

s/Bryan H. Hoss_________